UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
TROY SWAIN,

                                    *Plaintiff,*

            -against-

                                                                Case No.: 17-cv-05420 (JCM)

TOWN OF WAPPINGER, THE TOWN OF WAPPINGER
HIGHWAY DEPARTMENT, LORI JIAVA, individually and
in her capacity as Supervisor of the Town of Wappinger, THE
TOWN BOARD OF THE TOWN OF WAPPINGER, WILLIAM
H. BEALE individually and in his capacity as Wappinger Town
Councilman, WILLIAM CICCARELLI individually and in his
Capacity as Wappinger Town Councilman, JOHN J. FENTON
individually and in his capacity as Wappinger Town Councilman
individually and in his capacity as agent for the Town of
Wappinger,

                                    *Defendants.*
-----------------------------------------------------------------X


# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
# OF MOTION TO DISMISS

Gunilla Perez-Faringer, Esq.
*Attorney for Plaintiffs*
34 South Broadway, Suite 605
White Plains, New York 10601
(914) 574-3708
faringerlaw@gmail.com

TABLE OF CONTENTS

Preliminary Statement...............................................................................................1

Statement of Facts...................................................................................................1

Standard of Review..................................................................................................1

ARGUMENT:

POINT I:    DEFENDANTS HAVE FAILED TO PRESENT ANY
           ADMISSIBLE EVIDENCE...........................................................2

           A.  The pictures are not admissible under Federal Rule
               of Evidence 901.................................................................2

           B.  The pictures lack evidentiary value and must be disregarded...........3

           C.  The evidence was collected by improper means and must be
               excluded...........................................................................9


POINT II:   PLAINTIFF HAS ESTABLISHED HARASSMENT
           AND DISCRIMINATION...........................................................11

           A.  Plaintiff was subjected to a hostile work environment.................11

           B.  As to the "single racial slur" doctrine....................................11

           C.  As to the sufficiency of Plaintiff's complaints..........................13

           D.  As to Defendants' failure to investigate.................................14

           E.  As to the biased investigation.............................................15

           F.  As to the wage discrimination against Plaintiff..........................17


POINT III:  PLAINTIFF WAS DENIED EQUAL PROTECTION ....................18

           A.  As to the Defendants' liability under the Yick Wo doctrine...........19

           B.  As to Defendants' liability under the class of one theory..............20

           C.  As to Defendants' allegations regarding lack of comparators..........21

POINT IV:     PLAINTIFF WAS DENIED DUE PROCES.................................22

POINT V:     PLAINTIFF WAS SUBJECTED TO RETALIATION.....................24

        A.  Plaintiff's termination was retaliation for his
            workplace discrimination complaints......................................24

        B.  The pictures were used as a pretext for Mr. Swain's
            termination….......25

        C.  Plaintiff was subjected to post-termination retaliation..................27

POINT VI:    DEFENDANTS HAVE FAILED TO PRESENT
            ANY VALID DEFENSES..............................................................28

        A.  As to Defendants' claim to immunity.....................................28

        B.  Plaintiff has satisfied the *Monell* doctrine...............................30

POINT VII:   PLAINTIFF HAS ESTQABLISHED HIS RIGHT TO
            PUNITIVE DAMAGES.............................................................31

Conclusion..........................................................................................33

TABLE OF AUTHORITIES

<u>Cases:</u>

*Anderson v. Creighton,* 483 U.S. 653 (1987); *Pinder v. Johnson,*
    54 F.3d 1169 (4th Cir. 1995)................................................................................29

*Ayissi-Etoh v. Fannie Mae,* 712 F.3d 572, 577 (Dist. of Columbia Cir. 2012)........................14

*Anderson v. Creighton,* 483 U.S. 653 (1987).........................................................................29

*Batavia Lodge No. 196 v. New York State Div. of Human Rights,* 35 NY2d 143 (1947)............33

*Baron v. North Fork Bank,* 2009 N.Y. Misc. Lexis 3827 (New York Co. 2009)....................25

*Benitez v. Ham,* No. 9:04-cv-1159, 2009 WL 3486379 (NDNY 2009)................................10

*Castelluccio v. International Business Machines Corporation,* 2-14 U.S. Dist.
    Lexis 10058 (Dist. of Conn.)...........................................................................16

*Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532 (1985)............................................22

*Congregation Rabbinical College of Tarticov, Inc., v. Vill. of Pomona,*
    915 F.Supp. 2d, 574 (SDNY 2013)....................................................................19

*Elder v. Holloway,* 510 U.S. 510 (1994)............................................................................29

*Ewing v. Coca Cola Bottling Co. of N.Y., Inc.,* 201 WL 767070 (SDNY 2001)....................11

*Faragher v. City of Boca Raton,* 524 U.S. 775 (1998)....................................................12

*Ferrante v. American Lung Association,* 90 NY2d 623 (1997)..........................................19

*Hafer v. Melo,* 502 U.S. 21 (1991)....................................................................................30

*Hester v. United States,* 265 U.S. 57 (1924)....................................................................10

*Gomez v. Toledo,* 446 U.S. 635 (1980)..............................................................................29

*Hafer v. Melo,* 502 U.S. 21 (1991)....................................................................................30

*Hodgson v. Charles Martin Inspectors of Petroleum, Inc.,* 459 F.2d 303 (5th Cir. 1972)..........28

*Hester v. United States,* 265 U.S. 57 (1924)....................................................................10

*Hill v. Emory University,* 346 Fed.Appx. 390 (11th Cir. 2009).........................................26

*Hossani v. Western Mo. Medical Ctr*, 97 F.3d 1085 (8th Cir. 1996)......................................27

*Jensen v. Potter*, 435 F.3d 444 (2006)................................................................................12

*Johnson v. Strive East Harlem Empl. Group*,  990 F.Supp.2d 435 (SDNY 2014)..................32

*Jones v. Town of E. Haven*,  691 F.3d 72 (2d Cir. 2012)....................................................31

*Kennedy v. J.P. Morgan Chase & Co.*, 325 (F.Supp.2d 401, 411 (SDNY 2004)....................25

*Kregler v. City of New York*, 987 F.Supp.2d 357 (SDNY 2013).........................................16

*La Marca-Pagano v. Dr. Steven Phillips, P.C.*, 129 AD.3d 918 (2d Dept. 2015)...................26

*Lawrence vi. Sol G. Atlas Realty Co.*, 15-3087 (2d Cir. 2016)...........................................18

*Liverpool v. Con-Way*,  2009 Dist. Lexis 41349 (EDNY 2009).........................................28

*Leopold v. Baccarat, Inc.*,  239 F.3d 243, 246 (2d Cir. 2001)...........................................14

*Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012)......................................................24

*Luciano v. Olsten Corp.*,  110 F3d 210, 215 (2d Cir. 1997)...............................................26

*McCall v. Genpac, LLC*,  2015 U.S. Dist. Lexis 133762 (SDNY 2015)................................14

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).................................................3

*McGinest v. GTE Serv. Corp.*, 360 F.3d 1103 (9th Cir. 2004)............................................12

*Moneiro v. Temple Union High School Dist.*, 158 F.3d 1022 (9th Cir. 1998).......................13

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)..................................................30, 31

*Northeastern Fla. Chapter, Associated Gen. Contractors of America
v. Jacksonville*,  508 U.S. 656 (1993).............................................................................19

*Nettles v. LSG Sky Chefs*, 94 AD3d 726 (2d Dept. 2012)................................................17

*Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*,
508 U.S. 656 (1993).......................................................................................................19

*Ogden v. Wax Works, Inc.*, 214 F.3d 999 (8th Cir. 2000).................................................15

*Pa. State Police v. Suders*, 542 U.S. 129 (2004).............................................................12

*Panzella v. City of Newburgh*,  231 F.Supp.3d (SDNY 2017)........................................19, 20

*Patterson v. County of Oneida*, 375 F.3d 206 (2d Dept. 2004)...................................13, 16

*Pearson v. Callahan,* 555 U.S. 223, 244 (2009)..............................................................29

*Pinder v. Johnson*, 54 F.3d 1169 (4ᵗʰ Cir. 1995)............................................................29

*Prolux v. Citibank, N.A.*, 659 F.Supp. 972 (SDNY 1987)..............................................27

*Reed v. MBNA Marketing Sysems, Inc. et al.*, 333 F.3d 27 (1ˢᵗ Cir. 2003)...................14, 28

*Robinson v. Shell Oil Co.*, 519 U.S. 337, (1997)..............................................................28

*Malik v. Carrier Corp.*, 202 F.2d 97 (2d Cir. 2000)....................................................14, 15

*Matter of New York City v. Tr. Auth. v. State Div. of Human Rights*, 78 NY2d 207, 2016.........32

*Matter of Prodan v. New York State Div. of Human Rights,*
52 Misc.3d 446 (New York Co. 2015)..............................................................................21

*Matter of State Div. of Human Rights v. St. Elizabeth's Hospital*, 664 NY 684 (1985)............15

*Parrish v. Sollecito,* 258 F.Supp.2d 264 (SDNY 2003)..................................................25

*Sandiford v. City of New York,* Case no. 2012-cv-0431 (SDNY 2012)................................25

*Shannon v. MTA Metro-North R.R.*, 269 AD2d 218, 218 (1ˢᵗ Dept. 2000). ...........................33

*Signer v. Tuffy,* 66 Fed.Appx, 232 (2d Cir. 2003)..........................................................24

*Smith v Wade,* 461 U.S. 30 (1983)..................................................................................32

*Steiner v. Showboat Operating Co.*, 25 F.3d 1459 (9ᵗʰ Cir. 1994)...................................15

*Taddeo v. L.M. Berry & Co.*, 526 Fed.Appx, 121 (2d Cir. 2013)......................................2

*Tarascio v. NBC Universal*, 2016 Misc. Lexis 350..........................................................17

*United States v. Diaz,* 176 F.3d 52 (2d. Cir. 1999)..........................................................2

*United States v. Rommy,* 506 D.3d 108 (2d. Cir. 2006)....................................................2

*Vasquez v. Empress Ambulance Serv.*, 835 F.3d 267 (2d Cir. 2016)..................................16

*Warren v. Quality Care Serv. Corp.*, 1985 U.S. Dist. Lexis 22031.....................................21

*Whidbee v. Garzarelli Food Specialities, Inc.*, 223 F.3d 62 (2d Cir. 2000)...........................12

*Whalen v. Roe*, 429 U.S. 589 (1977)................................................................11

*Wright v. Town of Glenarden*, 89 F.3d 831(4th Cir. 1996)..............................................28

*Yanal v. Columbia Univ.*, 2006 NY Misc., Lexis 9354................................................17

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886)................................................................19

<u>Statutes:</u>

901 of the Federal Rules of Evidence................................................................1, 2

New York Town Law 32................................................................22, 23, 29

42 U.S.C. §1981(a)................................................................1, 17

42 U.S.C. §1983................................................................1,10,16,30, 32

PRELIMINARY STATEMENT

This memorandum of law is submitted in support of Plaintiff's motion for summary judgment and for an order excluding the photographic evidence upon which Defendants based its termination of Plaintiff as inadmissible under Rule 901 of the Federal Rules of Evidence and on the ground that it lacks evidentiary value. The bulk of the discussions herein pertains to Defendants Town of Wappinger, the Town of Wappinger Highway Department, Lori Jiava, the Town Board of the Town of Wappinger, William H. Beale, William Ciccarelli, John J. Fenton and Michael Kuzmicz, who will collectively be referred to as the "Town Defendants", "Town" or "Defendants". The arguments pertaining to Defendant Anthony Struss will be so indicated.

It is a well-settled principle of law that claims under Section 1981 and 1983 as well as under state law are generally analyzed under the same legal framework as Title VII claims, and will be discussed as such. The Plaintiff hereby preserve all claims of this case, whether or not separately discussed herein, for any potential future appeal.

STATEMENT OF FACTS

The facts of the case have been stated in detail both in the Complaint (attached as **Ex. B**) and in Plaintiff's Declaration in support of this motion. Therefore the facts will not be reiterated here, but referred to in the context of the arguments to which they are applicable.

STANDARD OF REVIEW

The standard of review for a court evaluating a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is the well-known burden-shifting framework as set down by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Furthermore, the Second Circuit has cautioned that "[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully

1

scrutinized for circumstantial proof, which, if believed, would show discrimination. *Taddeo v. L.M. Berry & Co.*, 526 Fed.Appx, 121, 122 (2d Cir. 2013 (internal citations omitted).

It is respectfully submitted that the wealth of evidence presented by Plaintiff defeats any arguments in support of summary judgment in favor of Defendants and are more than sufficient to support a favorable ruling on Plaintiff's motion for summary judgment.

## ARGUMENT

POINT I: DEFENDANTS HAVE FAILED TO PRESENT ANY ADMISSIBLE EVIDENCE

A. The pictures are not admissible under Federal Rule of Evidence 901

"Under Rule 901 of the Federal Rules of Evidence, authentication is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Illustrative examples of such evidence include testimony describing a process or system used to produce a result and showing that the process or system produces an accurate result." *United States v. Rommy,* 506 D.3d 108, 137 (2d. Cir. 2006). When a witness is "unable to offer foundation testimony for [a] photograph" it should be excluded as inadmissible". *United States v. Diaz,* 176 F.3d 52, 82 (2d. Cir. 1999).

It is respectfully submitted that Mr. Struss has failed miserably to offer a foundation for the pictures to prove that the process of affixing the date and time stamps produces an accurate result, and therefore they are inadmissible evidence under Rule 901. Throughout the proceedings Mr. Struss has repeatedly stated that he set the times on the camera himself "pretty much every day." (Struss tr. at 93, Ex. **RR**). It is clear that the Defendants have not been able to offer a foundation to establish that the video cameras produced an accurate result, and therefore the pictures are inadmissible and must be excluded.

Mr. Struss admits to having video recorded Plaintiff since he moved in next door to the Swain family on July 15, 2014 until Plaintiff was terminated on June 11, 2016. (tr. 47). He explains that his reasons for recording Plaintiff was animosity caused by perceived slights by Plaintiff, among other things his belief that it was Mr. Swain who had placed tree branches on his property that were on the ground when he moved in (tr. 8-11), the way Mr. Swain stared at him, referring to it as a "birddog" stare (tr. 16) and an alleged smell apparently from a broken septic tank although it was not clear who the tank belonged to and in any event "he might have had it repaired before I moved in," (tr. 24). Mr. Struss stated that he recorded Paintiff because "[a]nybody who all of a sudden advances to a higher position and I've seen it hundreds of times to guys to where their heads get all swollen, they think they are this, that, this, that..." (tr. 103).

During his deposition Mr. Struss explained that what prompted him to give the pictures to the Town was a newspaper article in the Poughkeepsie Journal on May 7, 2016 headlined "Town Probes Racial Charges" (**Ex. AA)** about the Town's investigation of Plaintiff's Complaint to the Division of Human Rights ("DHR"), stating that when he saw the article, "I realized the Town wasn't behind Swain... and I said, oh, wow... I think it is time for me to turn in these videos." (Struss tr. 26-27). Although Mr. Struss in his letter to the Town that accompanied the pictures described himself as a "concerned taxpayer" (**Ex. Z**) this appears to be an afterthought, and that his true motivation was simple spite for Mr. Swain's success in life.

### B.   The pictures lack evidentiary value and must be disregarded

Defendant Struss admits to not knowing when Mr. Swain was on his legitimate breaks (tr. 53) and states that Plaintiff "could be" on legitimate breaks when he is seen in the pictures. He states that one reason he gave the pictures to the Town was that he was concerned by the fact that Plaintiff sometimes parked the truck outside other houses than his own, which he considered less

3

secure because "anybody could come to this property, something could happen to the town truck." (tr. 82). Furthermore, it is clear that Mr. Struss is not a credible witness, as he specifically stated that hat Mr. Swain introduced himself as the Deputy Highway Supervisor when Mr. Struss moved in on July 15, 2015 (tr. 18-19) although he was not promoted until February 11, 2016.

Struss also admits that he is in the habit of video recording his neighbors, having recorded another neighbor as well because he was allegedly moving debris onto yet another neighbor's property. The thumb drive includes a video (picture no. 82) depicting a loud altercation between Mr. Struss, where he can be seen in a sleeveless green t-shirt subjecting that other neighbor to a loud tirade heavily laced with foul language, anti-Semitic slurs and sexual innuendo, concerning, among other things, the moving of debris.

Furthermore, it is clear even from a cursory look at the pictures that they do not constitute reliable evidence. A number of the pictures are included in hardcopy as **Ex. CC-1 through CC-5** to give the Court just a few examples. Among the pictures on the thumb drive is one taken in the winter (**Ex. CC-1**) that Mr. Struss adamantly claimed is evidence that Plaintiff was using a snow blower belonging to the Town during his paid work hours, although there is nothing in the picture, that is not even dated or timestamped, that indicates who owns the snow blower or when it was taken. Furthermore, in the list of pictures that was prepared by the Town Defendants for use as evidence of Mr. Swain's "conversion of public funds" (**Ex. DD**) that image (marked as #88) is indicated to have been taken on May 18, 2016, but is described as "snow blower @home"! "Conversion of public funds", also referred to as "theft of time", was the stated reason why Mr. Swain was terminated with immediate effect on June 14, 2016. His termination letter is attached as **Ex. GG**.

Photograph no. 105 (**Ex. CC-2**) shows Plaintiff tending his lawn at 12:17 pm, which was clearly during his legitimate lunch break that was between 12:00 and 12:30. In another picture, no, 104 (**Ex. CC-2)** he is seen mowing his lawn, also during his lunch break at 12:18. However, in that picture that is marked as taken on May 18, 2016, he is seen wearing jeans and a long-sleeved shirt and a hat although the temperature on the picture is recorded as 95 degrees F.

A check with the official weather data reported by radio station KPOU (**Ex. CC-3,** page 5), indicates that the recorded temperature on that day at 11:53 am was 64 degrees F and at 12:53 pm 66.9 degrees F. A temperature difference of 30 degrees Fahrenheit between the photograph and the recorded temperature is clear evidence that the data indicated on the pictures is wholly unreliable. As a comparison, in picture no. 105 Mr. Swain is wearing a short-sleeved t-shirt at a temperature recorded as 62 degrees F (*Id.*).

In addition, many of the pictures show Mr. Swain during days and times when he was clearly not working, such as pictures no. 186 and 23 (**Ex. CC-3**), both taken shortly after 6 am. Mr. Struss has also included two pictures of himself mowing his own lawn (**Ex. CC-4**), indicated to have been taken at 9:37 and 9:36 am, respectively. When asked why he was at home at 9.30 on April 13, 2016, and the Court is respectfully requested to take judicial notice of the fact that that day was a Wednesday, he stated "because I had to mow my lawn. I had the day off." (tr. 97).

The Thumb drive containing the pictures is attached as **EX. BB-2** and will be forwarded to the Court. It contains over 200 still pictures and videos. For unknown reason the pictures appear twice, both directly on the thumb drive and as duplicates in a separate folder. The photos are the same but numbered differently in the two places. The numbers referenced herein refer to the photographs on the flash drive, not the duplicates in the folder.

Even a superficial glance at the pictures reveals that in many photographs the time and/or date stamps do not correspond with the number sequence in which they appear, making it impossible to determine whether they are incorrectly numbered or if the time and date stamp are incorrect. The pictures have date stamps referring to eleven days between April 7, 2017 and May 19, 2016, however at least one day is a Sunday and many pictures show only an empty backyard or the truck parked in the street. There are also 23 pictures that have no date or time stamp. Furthermore, many pictures have time stamps that indicate that they are taken either early in the morning before Mr. Swain went to work or late in the afternoon after work hours.

On May 9, 2016 there are no less than 26 pictures taken between 12:17:35 and 12:25:41 (pictures no. 102-145), that is, *within less than eight minutes*, and all during Mr. Swain's scheduled lunch break. On the same date there are five photos taken between 06:08:25 and 06:12:42 (pictures no. 23 through 27), that is, within less than four minutes taken before Mr. Swain's workday that began at 7:00 am.

Mr. Struss claims that the photographs proves that Mr. Swain was using town equipment such as a weed-whacker and a snow blower, however there is nothing in the pictures that indicates the ownership of the tools. On the list prepared by the Town defendants, **Ex. DD,** there are two pictures (218 and 10) that are indicated to have been taken on Sundays and five photographs and one video (marked 23 through 27, 186) that are indicated to have been taken shortly after 6 am. It is wholly unknown why the defendants would have included those photographs on a document that was intended as evidence of Mr. Swain's conversion of public funds.

Furthermore, while one photograph on the list is alleged to have been taken on Sunday, April 24, 2016 and marked as "Picture #10 – 5:08 pm – home", even though there are two images (for the reasons stated above) marked no. 10, both of them lack time stamps; in addition, even if it

had actually been taken at 5:08 pm on a Sunday, that is clearly both after Mr. Swain's work hours and on his day off.

As Mr. Swain explained in his Declaration, following his termination from the Highway Department he applied for unemployment benefits which were initially denied but thereafter granted as a result of the Administrative Law Judge's realization that the pictures that were introduced as the only evidence of Mr. Swain's alleged conversion of public funds, lacked evidentiary value. (**Ex. JJ**).The Town then appealed the decision by the Unemployment Insurance Appeal Board.  In his affirmation in support of the Town's appeal of the decision, David Wise, the Town's attorney, included a list of 15 photographs and videos. (**Ex. II,** pp. 3-4):

- Two photographs are listed as taken on May 9, 2016 on 13:45 and 13:46 over a span of one minute.

- Five photographs and two videos are listed as taken on May 18 between 11:24 and 11:33 over a span of nine minutes.

- Two photographs and one video are listed as taken on May 18, 2016 between 14:32 and 14:33, over a span of one minute.

- One photograph is listed as taken on April 7, 2018 at 11:23

- One photograph is listed as taken on May 19 at 10:04

- One photograph is listed as taken on May 19 at 8:04.

As the Court can see, the Defendants, in their efforts to prevent Mr. Swain to receive unemployment benefits, Defendants presented the Administrative Law Journal with a list of 15 pictures taken over a total time of less than 15 minutes! Mr. Wise himself during his deposition (See transcript attached as **Ex.** QQ) explained that he had contacted the District Attorney's office to request an investigation into the possibility of criminal wrongdoing, however no investigation

was ever undertaken because the District Attorney would not prosecute unless there was direct evidence of a loss of at least $5,000. This could not be established, Mr. Wise explained, because "in many instances there was a single picture from a single day that had a time stamp which was a time outside the break limits provided to us by Mr. Bettina [the Highway Superintendent] because in many instances there were [only] single pictures we could not determine when he started and when he ended." (tr. at 93).

Even so, Mr. Swain without hesitation used the photographic material to recommend that Mr. Swain be terminated "for theft of services". In several instances Mr. Swain has been photographed and/or videotaped performing services on his own property during work hours and using Town equipment. Although I expect Mr. Swain to claim retaliation due to him having filed a complaint with the NYSDHR, that will not be an effective defense to theft." Email from Mr. Wise to Ms. Jiava and the Town Board dated June 2, 2016 (**Ex. EE,** p.8).

During his deposition Mr. Wise was also asked what measures he had taken to verify the authenticity of the pictures before recommending that Mr. Swain was terminated:

> Q:    What measures did you take, if any, to verify the correctness of those times and dates on all the pictures?
>
> A:    We accepted the times and dates on the photographs as authentic and accurate.
>
> Q:    On what basis?
>
> A:    On the basis that we believed them. (tr. at 112).

He also denied having spoken more than a few minutes with Mr. Struss, and saw no reason to verify his credibility as a witness (tr. 57) or inquire what Mr. Struss' reason was for video recording his neighbor. (tr. 43).

The Town's appeal was denied. In her decision (**Ex.** JJ) Judge Chatterton wrote, in part:

The Superintendent was flexible with the times that employees took their breaks. ... the Claimant did not falsify his time beginning March 7, 2016, ending May 26, 2016. The claimant's neighbor with whom he had personal disagreements, took photographs and videos of him doing various types of yard work during the spring of 2016; however, the timestamps on the photographs and videos are not accurate. ... [T]he Superintendent admitted that he permitted the claimant to go home on his breaks and that he did not have to clock in or out for breaks. I am not persuaded by the employer's contention that the photographs and videos taken by the claimant's neighbor are evidence that the claimant falsified his time. In reaching this conclusion I credit the claimant's first-hand testimony that he did not drive the truck on the weekends and therefore I conclude that the timestamps on the photographs and videos are unreliable since one purports to show the claimant's truck being driven on a Sunday. Hearsay evidence cannot prevail against sworn testimony when there is nothing in the record tending to impeach the sworn testimony. [citation omitted]. Even accepting the photographs and videos at face value, I am not satisfied that they or the neighbor's corresponding testimony necessitate a conclusion that the claimant falsified his time. ... Under the circumstances, the claimant's actions that resulted in the decision to terminate his employment do not constitute misconduct.... The initial determination [denying Mr. Swain unemployment benefits] is overruled.

Testimony by both Mr. Swain and Mr. Bettina indicated that the Highway employees' break times were flexible out of necessity, since the crew often conducts work on the roads that cannot be interrupted for beaks. Even so, Mr. Wise claimed that he recommended that Mr. Swain be terminated because "Mr. Bettina was adamant that they get a 9 o'clock am fifteen minute break, a 2 pm fifteen minute break and a 30 minute lunch from 12 to 12.30 and he was adamant that those times do not vary." (tr. 37).

### C. The pictures were acquired by improper means and must be excluded

As has been explained *supra,* it appears that Mr. Struss was initially video recording Mr. Swain family as a result of personal animosity but later decided to hand over the pictures to the Town with allegations of "theft of time". It is clear that Mr. Struss' recording the pictures and giving them to the Town Board and the Town's unquestioning acceptance of them without any inquiry as to Mr. Struss' motive for collecting them or any explanations as to how the date and

time stamps appeared on the pictures constitutes conspiracy between the Defendants, with Mr. Struss acting as an agent by ratification for the Town.

The Supreme Court has ruled that individuals generally maintain a reasonable expectation of privacy in their bodies, clothing and personal belongings. Homeowners possess privacy interest that extends inside their homes and in the curtilage immediate surrounding the outside of their homes." *Hester v. United States*, 265 U.S. 57 (1924). It is respectfully submitted that by continuously video recording Plaintiff on his own property for over two years, and for the Town to accept the pictures for the purpose of using them as a pretext to terminate Mr. Swain, the Defendants conspired to inflict injury on Mr. Swain.

"To prove a § 1983 conspiracy, a plaintiff must show (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Benitez v. Ham*, No. 9:04-cv-1159, 2009 WL 3486379 at 18 (NDNY 2009) (internal citations omitted).

However, in addition to simply recording Mr. Swain on his own and handing them over to the Town, eventually Mr. Struss was directly assigned to do so by Ms. Jiava herself. During his deposition Mr. Struss explained that on June 10, 2016 he received a phone call from Ms. Jiava asking him "if he see anything funny [was] going on next door." (Struss transcript at 65, **Ex. RR**).

He told her that "[Mr. Swain] is in his backyard skimming his pool and she informed me, well, he's going in to surgery tomorrow to have an operation during while he's taking sick time from the town." *Id.* "I said oh really he's – it looks like he's pretty healthy to me. So then I said I'll get a picture of it for you since it's town time off so that he's – I put the camera up there to see how my taxpaying money is being spend and sure enough the next morning Mr. Swain was

skimming his pool on the 11th." (tr. 62). As Mr. Swain explained in his Declaration, on June 11, 2016 he was recovering from emergency surgery for appendicitis. His medical records are attached as **Ex. X.**

It is well established that the individual right to privacy is protected by the Due Process Clause of the Fourteenth Amendment. *Whalen v. Roe*, 429 U.S. 589 (1977). "Medical information … is information of the most intimate kind [and] the right to confidentiality includes the right to protection regarding information about the state of one's health." *O'Connor v. Pierson*, 426 F.3d 187, 201 (2d Cir.2005) (internal citation omitted). Therefore Mr. Swain had a clearly protected privacy right to the health information and the disclosure of his planned surgery to Defendant Struss was grave violation of his constitutional right to privacy. Even though the pictures taken by Mr. Struss on June 11 have not been introduced into evidence it is clear that their conspiracy to violate Mr. Swain's privacy and Ms. Jiava's disclosure of confidential employee data for the purpose of spying on Mr Swain is proof of their nefarious motives that raise very serious questions about the motives for their actions.

## POINT II: PLAINTIFF HAS ESTABLISHED HARASSMENT AND DISCRIMINATION

### A. Plaintiff was subjected to a hostile work environment

To establish a hostile work environment a plaintiff must demonstrate that: "(1) she is a member of the protected class; (2) she experienced unwelcome harassment; (3) the harassment was based on her membership in the protected class; (4) the harassment was severe or pervasive enough to create a hostile work environment; and (5) a basis for employer liability exists." *Ewing v. Coca Cola Bottling Co. of N.Y., Inc.*, 201 WL 767070 at 7 (SDNY 2001) (internal citation omitted). However, the work environment does not need to be deemed "unendurable" or "intolerable" in order to be deemed "hostile" and the Second Circuit has "repeatedly cautioned

11

against seeting the bar too high." *Whidbee v. Garzarelli Food Specialities, Inc.,* 223 F.3d 62, 70. (2d Cir. 2000).

The Supreme Court's standard for discrimination is "severe *or* pervasive." *Pa. State Police v. Suders,* 542 U.S. 129, 133 (2004) (emphasis added). "The disjunctive phrasing means that 'severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable conduct will contaminate the workplace only if it is pervasive." *Jensen v. Potter,* (435 F.3d 444 [2006]), footnote 3 (internal citations omitted).

It is respectfully submitted that Mr. Swain has submitted sufficient evidence in his complaints to the Town and the DHR (**Ex. Q, T**) to establish that he was subjected to a hostile work environment. His coworkers would call him racial slurs, isolate him and force him to do work alone that should have been done by two people, among other things. Contrary to the Town's allegations that the harassment was insignificant it is clear that Plaintiff was subjected to actionable harassment on the ground of membership in a protected class.

B.  As to the "single racial slur" doctrine

Although isolated incidents ordinarily will not rise to the level of a hostile work environment,"*even a singular incident of sufficient severity may so alter the terms and conditions of employment as to create such an environment."* *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (emphasis added).

The word 'nigger,' perhaps more than any other, "evok[es] a history of racial violence, brutality, and subordination. This word is 'perhaps the most offensive and inflammatory racial slur in English … a word expressive of racial hatred and bigotry." *McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1106 (9th Cir. 2004) (internal citation omitted). Whether the alleged conduct "was so

severe or pervasive as to create an objectively hostile or abusive work environment is to be decided based on the totality of the circumstances." *Patterson v. County of Oneida*, 375 F.3d 206, 227 ([2d Dept. 2004]) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993).

"As several courts have recognized… a single *verbal* (or visual) incident can likewise be sufficient to justify a finding of a hostile work environment … [E]ven a single episode of harassment, if severe enough, can establish a hostile work environment." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (Dist. of Columbia Cir. 2012), *Kavanaugh, Circuit Judge, concurring.* "That epithet has been labeled, variously, a term that 'sums up… all the bitter years of insult and struggle in America [citing Langston Hughes, The Big Sea] *Id.* Furthermore, it is important to note that as opposed to what Defendants have argued, "racist attacks need not be directed at the complainant in order to create a hostile [work] environment." *Moneiro v. Temple Union High School Dist.*, 158 F.3d 1022, 1033 (9th Cir. 1998) (internal citations omitted).

### C. As to the sufficiency of Plaintiff's complaints

In her answering affidavit to Plaintiff's complaint with the Department of Human Rights Ms. Jiava claimed that he "*never* communicated any complaints of any harassment on the part of any co-employees, or anyone else, to either the Town Supervisor or to any member of the Town Board." **Ex. R.** This is a patently false statement, as Mr. Swain has explained in his Declaration and in his two complaints, he contacted his union representative and his superiors, and once he wrote a letter to the Town Board regarding the unfair allocation of snow routes (**Ex. P**), but he never received any response.

Ms. Jiava states that under the Town's anti-harassment policy "any employee who believes he has been subjected to prohibited harassment is required to report complaints of any harassment to either the Town Supervisor or to any member of the Town Board" **Ex. R.** That might be so,

13

however such a provision does not have support in the law. "Informal complaints to supervisors, instituting litigations, or filing a formal complaint are protected activities under Title VII." *McCall v. Genpac, LLC,* 2015 U.S. Dist. Lexis 133762 (SDNY 2015) at 72 (internal citations omitted).

Furthermore, as Mr. Swain explained in his Declaration, he was never given the Employee Manual (**Ex. MM**); as a member of the CSEA he only received the Collective Bargaining Agreement, ("CBA") (**Ex.** K) which contains nothing about a hostile work environment or how to report any complaints. It is also clear that one important reason why Mr. Swain did not make any formal, written complaint until the situation was so grave that he suffered a mental breakdown was, as he explained in his Declaration, a very real – and, as is clear, well-founded – fear that it would jeopardize his job.

"For that reluctance to report harassment to preclude the employer's affirmative defense, it must be based on apprehension of what the employer might do. … Evidence must be produced to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints." *Leopold v. Baccarat, Inc.,* 239 F.3d 243, 246 (2d Cir. 2001) (internal citations omitted).

When "the jury could find that the plaintiff believed that [he] would lose [his] job if [he] reported further incidents to the supervisor... the failure to report was excusable." *Reed v. MBNA Marketing Sysems, Inc. et al.,* 333 F.3d 27, 34 (1ˢᵗ Cir. 2003) (internal citations omitted).

D.  As to Defendants' failure to investigate

"Section 1983 liability can be imposed upon [an employer] for failing properly to investigate and address allegations of [racial] harassment when through this failure, the conduct becomes an accepted custom or practice of the employer." *Patterson* at 224 (2d Dept. 2004) (internal citations omitted).

It is respectfully submitted that there can be no doubt that Plaintiff has sufficiently demonstrated the Town's failure to investigate, since it did not do so until he had already filed two formal complaints. The Ninth Circuit has held that a failure to investigate until after charge filed with a state agency is inadequate. *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1464 (9th Cir. 1994).

Furthermore, the complete failure to investigate the allegations based on the clearly inadmissible photographic evidence demonstrate a grievous denigration of Mr. Swain's right, and even of truth itself.

Under New York law, in order to recover against an employer, the complainant must demonstrate that the employer acquiesced in the discriminatory conduct or subsequently condoned it. *Matter of State Div. of Human Rights v. St. Elizabeth's Hospital,* 664 NY 684, 687 (1985). The Court of appeals continued: "Condonation … contemplates a knowing, after-the-fact forgiveness or acceptance of an offense. *An employer's calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation." Id.* (emphasis added)

"[A]n employer is responsible for acts of … harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can be shown that it took immediate and appropriate corrective action." *Malik v. Carrier Corp.,* 202 F.2d 97, 105 (2d Cir. 2000) (internal citations omitted. " "[A]n employer's failure to investigate may allow a jury to impose liability on the employer." *Malik* at 105.

### E.  As to the biased investigation

The manner in which an investigation is conducted is of crucial importance.  A cursory investigation focused on complainant's performance rather than the harasser's conduct does not establish an affirmative defense. *Ogden v. Wax Works, Inc.,* 214 F.3d 999 (8th Cir. 2000)."[T]he adequacy of [an] investigation is intertwined with the cat's paw theory of liability,' as determined

by a 'negligence standard'." *Vasquez v. Empress Ambulance Serv.,* 835 F.3d 267, 274 (2d Cir. 2016), whereby the insufficiency of an employer's investigation of employment discrimination supports imposition of employer liability. *Id.*"Some circuits have held that an employer cannot shield itself from liability by using a purportedly independent person... as the decisionmaker where that decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." *Kregler v. City of New York*, 987 F.Supp.2d 357, 366 (SDNY 2013) (internal citations omitted). While the Second Circuit found that the theory was not applicable to the facts of that particular case, "several Circuits have either held or assumed that cat's paw liability would be available under § 1983." *Id.* (internal citations omitted).

It is respectfully submitted that the "cat's paw" theory is fully applicable to the case at bar, both in reference to Mr. Bernstein's report (**Ex. U**), whose only identifiable conclusions were that Mr. Swain's testimony was not "credible" and that Mr. Bettina had created a "toxic atmosphere", and the cursory analysis of the photographs and videos by Mr. Wise as well as the Town Board were clearly biased and intended to support an unlawful termination of Plaintiff in violation of his constitutional procedural rights. Under the "cat's paw' theory it is clear that the Defendants cannot shield themselves from liability for Mr. Swains' retaliatory termination and the discrimination against him by relying on the advice of Mr. Bernstein and Mr. Wise.

When an investigation into discrimination is undertaken by an employer and there is reason to believe that "the investigation represented only the findings and conclusion [of the employer] and the plaintiff "was not offered the opportunity to present his own evidence, cross examine the witnesses or respond to criticisms leveled against him ... and there was reason to suspect that the investigation was designed more to exonerate [the employer] than to determine if the [plaintiff] was treated fairly" the prejudicial effect of the results of the employer's investigation would

outweigh its probative value and the findings must be excluded. *Castelluccio v. International Business Machines Corporation*, 2-14 U.S. Dist. Lexis 10058 at 30 (Dist. of Conn.) It is respectfully submitted that that is exactly the case in this situation.

F.  <u>As to the wage discrimination against Plaintiff</u>

42 U.S.C. §1981(a) "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson* at 224 (internal citations omitted).  If an employee is promoted and given increased responsibilities "without commensurate increase in salary" as a result of his membership in a protected class, creates an inference of discrimination. *Nettles v. LSG Sky Chefs*, 94 AD3d 726, 729 (2d Dept. 2012). (internal citations omitted).

"A prima facie case of discrimination based on disparate pay, requires plaintiff to show that she is a member of a protected class and that she was paid less than similarly situated nonmembers of the class." *Yanal v. Columbia Univ.*, 2006 NY Misc., Lexis 9354 at 11 (internal citations omitted). However, "[i]n employment discrimination cases … direct evidence of an employer's discriminatory intent is rarely available." *Tarascio v. NBC Universal*, 2016 Misc. Lexis 350 at 19.

As explained by Mr. Swain in his Declaration, he naturally expected increased compensation when he was promoted to a managerial position and was promised by Mr. Bettina that he would receive a "stipend" as the pay to the Deputy Highway Superintendent was called, which in fact he never happened.

This contention has its origin in the fact that the CSEA does not recognize the Deputy as a classification of employees. During her deposition, Ms. Jiava vocally vocally advocated her opinion that "there is no such position as deputy" (tr. 38, **Ex. OO**); therefore he had not been promoted and therefore could not get paid more than his MEO salary. This, of course, is directly

17

contradicted by the fact that Mr. Swain was sworn in as Deputy on February 11, 2016 (**Ex. G**), by the fact that his predecessor, George Silvestri, had the position as Deputy for over 40 years and by Ms. Jiava's own statement in her Affidavit in opposition to Plaintiff's complaint to the DHR (**Ex. R**), where she states that "In February of 2016, Complainant was promoted to the position of deputy Highway Superintendent."

Mr. Silvestri is Caucasian, and, in spite of the efforts to eliminate the position as Deputy, soon after Mr. Swain was terminated his successor, also Caucasian, was appointed, who upon information and belief does receive the stipend. It is respectfully submitted that the Town's reliance on the Collective Bargaining Agreement to refuse to acknowledge Mr. Swain's position as the deputy highway superintendent with compensation commensurate to that position must fail. The Deputy Highway Superintendent "[d]uring the absence or inability of the town superintendent of highways to act" is "vested with all the powers and duties of the town superintendent as provided by law." NY CLS Town § 32 (**Ex. HH**). Therefore, it is clear that the deputy superintendent is a supervisory position and not part of a collective bargaining unit, and as a result the Collective Bargaining Agreement is not applicable.

Furthermore, the Second Circuit has held that "the CBA does not effectuate a clear and unmistakable waiver" of an employee's statutory rights. *Lawrence vi. Sol G. Atlas Realty Co.,* 15-3087 (2d Cir. 2016) at 11.

POINT III: PLAINTIFF WAS DENIED EQUAL PROTECTION

To state an equal protection claim on a theory of selective enforcement or selective treatment a plaintiff must show that (1) he compared with others similarly situated, was selectively treated and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, or to punish or inhibit the exercise of

18

constitutional rights, or by a malicious or bad faith intent to injure the plaintiff." *Panzella v. City of Newburgh,* 231 F.Supp.3d , 13  (SDNY 2017).

"[D]enial of equal treatement" is an "injury in fact." *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville,*   508 U.S. 656, 666 (1993) However, "[d]iscrimination is rarely so obvious or its practices so overt that recognition of it is instant and conclusive, it being accomplished usually by devious and subtle means" *Ferrante v. American Lung Association,* 90 NY2d 623 (1997).

"The Second circuit has identified three common methods of establishing a violation of equal protection by intentional discrimination: (1) identifying a law that expressly classifies on the basis of race; (2) identifying a facially neutral law or policy that has been applied in an unlawfully discriminatory manner; or (3) identifying a facially neutral law or policy that has an adverse effect and that was motivated by discriminatory animus. "*Congregation Rabbinical College of Tarticov, Inc., v. Vill. of Pomona,* 915 F.Supp. 2d, 574, 617 (SDNY 2013) (internal citations omitted). The latter doctrine is, as the Court knows, based on the rule from *Yick Wo v. Hopkins.*

A. As to Defendants' liability under the Yick Wo doctrine

In *Yick Wo v. Hopkins* (118 U.S. 356 [1886]) the Supreme Court of the Untited States for the first time struck down a law that, while neutral on its face, was adopted with a constitutionally impermissible purpose. It is respectfully submitted that the Town's sudden change of its vehicle policy (**EX. N**) exactly two months after Plaintiff was appointed Deputy was,  although neutral on its face, was adopted with a constitutionally impermissible purpose under the *Yick Wo* doctrine.

Although, as stated by Ms. Jiava, the Town never had a written vehicle policy, both the Highway Superintendent and the Deputy always had the exclusive use of a Town truck, which, upon information and belief is the case in all other towns in Dutchess County, the Deputy always

had an assigned vehicle as far back as anyone can remember, and there was never any perceived need to have a written policy. In her deposition Ms. Jiava stated that "We implemented [a written vehicle policy] because… we needed one for four new vehicles that we were getting in the building department." (tr. 17, **Ex. OO**)

It is unclear why the acquisition of new trucks in the building would necessitate the rules for the exclusive use of a truck by the Deputy Highway Superintendent, and according to Mr. Bettina "[i]t had nothing to do with the purchase [of trucks]" (tr. 48, **Ex. RR**). It is respectfully submitted that the new Vehicle Policy and Ms. Jiava's newfound conclusion that "there is no such thing" as Deputy Highway Superintendent position, prompting her to eliminate his exclusive use of the truck, both of which were implemented shortly after Mr. Swain was promoted to Deputy, are clearly laws and regulations that are neutral on their face but constitutionally impermissible under the *Yick Wo* doctrine.

### B. As to Defendants' liability under the class of one theory

"To allege an Equal Protection Clause violation under a class-of-one theory, the plaintiff must allege that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (2) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Panzella* at 12 (internal citation omitted).

It is respectfully submitted that Mr. Swain must be compared to Mr. Silvestri under the class of one theory. Both men swore an oath as Deputy Highway Superintendents and with the same rights, duties and responsibilities, however Mr. Silvestri had the exclusive use of a Town truck and was paid a stipend (in addition to his higher seniority pay) while Mr. Swain, as the first

20

African-American ever on the position, does not. It is respectfully submitted that Mr. Plaintiff has established racial discrimination under the class of one doctrine.

### C.  As to Defendant's allegations regarding lack of comparators

In *Warren v. Quality Care Serv. Corp.* the court the court stated: "Defendant has incorrectly argued that given the fact that defendant had cause to discharge plaintiff, 'the only way' plaintiff could prove racial discrimination would be to demonstrate that similarly situated white employees committed the same acts but were not terminated. On that view, a black plaintiff could never prove discrimination if he was fired for an offense which no white employees had ever committed, no matter how compelling the other evidence of discriminatory intent might be." 1985 U.S. Dist. Lexis 22031 (WDNY 1985) at 17.

The fact that there were no other African-American employees in the highway department does not negate the reality that Mr. Swain was harassed and discriminated against on the basis of his race. All his coworkers were white and "since they were in the racial majority, no evidence indicates they were the victims of racial slurs or harassment." *Matter of Prodan v. New York State Div. of Human Rights*, 52 Misc.3d 446, 453 (New York Co. 2015). In *Podan* the plaintiff was the only white person in a homeless shelter, causing the court to conclude that "the record fail[ed] to negate the inference that [defendant's] failure to respond to white or other non-African American[s]... complaints of racial slurs or harassment was unrelated to their color, rendering NYSDHR's contrary determination ...arbitrary." *Id.*

It is respectfully submitted that based on all the facts and circumstances it is clear that Plaintiff has established racial harassment and discrimination under all applicable laws, and therefore he is entitled to summary judgment.

POINT IV: PLAINTIFF WAS DENIED DUE PROCESS

In *Cleveland Bd. of Educ. v. Loudermill* (470 U.S. 532 [1985]) the Supreme Court held that "[t]he principle that under the Due Process Clause an individual must be given an opportunity for a hearing *before* he is deprived on any significant property interest requires 'some kind of hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Id.* at 532 (emphasis in original).

There can be little doubt that Mr. Swains due process rights were egregiously violated in every possible way. His letter of termination (**Ex. GG**) states that he was terminated "under Article IX, Section 5 of the Collective Bargaining Agreement between the Town and CSEA. The Town Board voted unanimously on June 13 to terminate him. Initially the irony in this statement must be noted, were the second sentence negates the first. The CBA, as well as Town Law § 32, does not provide the Town Board with the authority to make personnel decisions for the Highway Department; that power rests solely with the Highway Superintendent. Further, the claim that his termination was effectuated "under Article IX, Section 5 of the Collective Bargaining Agreement" is patently false. The CBA contains a clearly articulate disciplinary procedure:

"No employee shall be disciplined or discharged without just cause. Just cause shall be subject to the grievance procedure as per this Article – Section 6. There shall be a five (5) step disciplinary process.

1. Warning
2. Reprimand
3. Suspension without pay for up to three (3) days
4. Suspension without pay for no less than four (4) and no more than ten (10) days
5. Termination

The facts of this case makes it overwhelmingly clear that Mr. Swain was terminated in grave derogation of not only the Collective Bargaining Agreement but of every due process law

and statute in existence. Mr. Swain was not given a warning – as a matter of fact he has never received a warning or been written up in his life – , he was never reprimanded and he was never suspended. He was simply served with a letter on his sickbed, based on pictures he didn't know existed and that he was never allowed to see, without a chance to say a single word in his defense or even ask a question.

For the Town to argue that Mr. Swain was terminated under anything that could even begin to resemble fairness, good faith, just cause or in keeping with procedure of any kind could only be called a fraudulent misrepresentation. It is equally disingenuous of Mr. Wise to state that "Under the terms of the CSEA CBA, the Town first exercises the right to terminate and the employee can then grieve the termination." (email to William Beale June 7, 2016, **Ex. EE** p. 5). As the Court can see, the CBA disciplinary process states the exact opposite. It is clear that Mr. Wise's claim that Mr. Swain's only resort would be to grieve his termination after it had been effectuate is not only in direct violation of the CBA but also in violation of Plaintiff's constitutional rights.

It is well settled that "the state-law property interest of government employees who may only be discharged for cause is a constitutionally protected property interest for purposes of the Fourteenth Amendment," *O'Connor* at 196. "The essential requirements of due process are notice and an opportunity to respond." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)

For elected town officials to terminate a highly qualified and high performing employee on the basis of illegally gathered and clearly unreliable and non-authenticated evidence is in stark violation of the CBA, the Town Law and Mr. Swains's statutory and constitutional rights.

In this connection it must also be noted that Mr. Bettina did not approve of Mr. Swains immediate termination, in spite of both Ms. Jiava's and Mr. Wise's vocal claim that he refused to look at the pictures and in essence had instructed the Town Board to terminate him. To the

contrary, in an email dated June 13, 2016 he states that "I will not be terminating Troy Swain as recommended by David Wise, Esq. but will act in accordance with the disciplinary procedure as outlined in the Collective Bargaining Agreement." **Ex. EE,** p. 1. He also wrote a letter to the town board to protest the decision, stating "I never requested that a termination of employee 9486 be undertaken by the Town Board." and even suggested a revised version of the resolution. **Ex. HH**

## POINT V: PLAINTIFF WAS SUBJECTED TO RETALIATION

A. Plaintiff's termination was retaliation for his workplace discrimination complaints

To make out a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in protective activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse action." *Lore v. City of Syracuse,* 670 F.3d 127, 157 (2d Cir. 2012). Adverse employment actions are considered "material" if they are "of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.: *Signer v. Tuffy,* 66 Fed.Appx, 232, 235 (2d Cir. 2003).

"[I]n order to establish the causal connection between an adverse employment action and a protected activity [a plaintiff] must demonstrate… that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent. A plaintiff may prove that retaliation was a motivating factor behind an adverse employment action either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment , or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence or retaliatory animus directed against the plaintiff by defendant.

"A close temporal relationship between a plaintiff's participation in a protected activity and an employer's adverse action is alone sufficient to establish causation, without direct evidence in support." *Parrish v. Sollecito,* 258 F.Supp.2d 264, 268 (SDNY 2003) (citations omitted). The Second Circuit held in *Kennedy v. J.P. Morgan Chase & Co.,* 325 (F.Supp.2d 401, 411 ([SDNY 2004]) that five months is sufficient proximity in time to establish a causal relationship. "Plaintiff was fired only months after he brought [the] lawsuit. He was fired despite the fact that his supervisor recommended that he be retained. ... That is enough to get Plaintiff's retaliatory discharge claim to trial." *Kennedy* at 411, "Strong public policy considerations dictate a broad application of the Human Right Law's protections, which should be interpreted liberally to achieve their intended purpose." *Baron v. North Fork Bank,* 2009 N.Y. Misc. Lexis 3827 (New York Co. 2009).

It is respectfully submitted that, based on the facts pleaded in the complaint it is clear that Plaintiff did engage in a protected activity, *to wit,* file complaints with the Town and with the New York State Department of Human Rights complaining about the harassment he was subjected to, his employer was aware of it and that he did suffer several adverse employment actions, *to wit,* retaliatory termination and post-termination retaliation.

### B.  The pictures were used as a pretext for Mr. Swain's termination

In response to a complaint of retaliation the defendant must produce a nondiscriminatory reason for plaintiff's termination."[W]here plaintiff responds with some evidence that at least one of the reasons proffered by defendant is false, misleading or incomplete, a host of determinations properly made only by a jury come into play, and thus such evidence of pretext should in almost every case indicate to the court that a motion for summary judgment must be denied." *Sandiford v. City of New York,* Case no. 2012-cv-0431 (SDNY 2012).

25

A plaintiff must ultimately prove that employer's proffered reason is pretext for retaliation. In order to demonstrate pretext, the plaintiff must show "that the employer's offered reason was not the true reason for its decision, either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Hill v. Emory University,* 346 Fed.Appx. 390 (11th Cir. 2009). "[A]n employer who discriminates is unlikely to leave a 'smoking gun' such as a notation in an employee's personnel file, attesting to a discriminatory intent." An employer's discriminatory intent usually must be proved by the weight of the circumstantial evidence alone. *Luciano v. Olsten Corp.,* 110 F3d 210, 215 (2d Cir. 1997).

Due to the increasing racial hostility he was subjected to, and after having suffered a nervous collapse, on April 7, 2016 he filed the workplace violence incident with the Town and shortly thereafter he filed the same complaint with the Division of Human Rights (**Ex. Q, T**).

Only two months thereafter, on June 14, Mr. Swain was terminated with immediate effect on the basis of photographs that he did not know existed, that he was not allowed to see and, as has been discussed at length herein, clearly constitute inadmissible evidence without probative value. Just as in *La Marca-Pagano v. Dr. Steven Phillips, P.C.* (129 AD.3d 918 [2d Dept. 2015]) the photographs and videos presented by Defendants "tend[] to show that the legitimate, nonretaliatory reasons given for the plaintiff's termination were 'false' and therefore pretextual." *Id.* at 922 (internal citations omitted).

Based on all the facts and circumstances of this case there simply can be no doubt that Mr. Swain was terminated in retaliation for finally having taken the step to file formal complaints about the racially hostile work environment, and it is equally without doubt that the Town used Mr. Struss' picture as a pretext to discharge him.

Pretext can also be shown if the employer subjected the employee's work performance to heightened scrutiny after engaging in the protected activity. *Hossani v. Western Mo. Medical Ctr,* 97 F.3d 1085, 1088-90 (8th Cir. 1996). It is clear that Ms. Jiava's engagement of Mr. Struss to spy on Plaintiff when he was on paid, legitimate sick leave before going into surgery, is evidence of Defendants' retaliatory intent.

Furthermore, an employee's complaint does not have to be valid or reasonable. In *Prolux v. Citibank, N.A.,* 659 F.Supp. 972 (SDNY 1987) the court found that the plaintiff was protected from retaliatory discharge in spite of the fact that the charges were both false and malicious. Therefore, even if, *per arguendo,* Mr. Swain's complaint did not rise to the level of actionable harassment, which in fact they did, the Town would still be liable for having retaliated against him by terminating his employment.

### C. Plaintiff was subjected to post-termination retaliation

Plaintiff's unemployment benefits were initially denied on the ground of the Town's allegations of termination for cause, a decision that was reversed when the Administrative Law Judge had determined that the pictures the decision was based on were not competent evidence because "the timestamps on the photographs and videos are not accurate." (**Ex. JJ**).

Thereafter, even after the Unemployment Board's finding that the timestamps on the pictures are not accurate and relying on the 15 photos and videos in Mr. Wise's brief (**Ex. II**) as discussed above, the Town appealed the decision, which caused Mr. Swain to be without income for eight months until the appeal was denied.

The appeal was undertaken in spite of the fact that Mr. Wise himself admitted that because many pictures consisted of only a single frame (or one-minute videos) it is impossible to determine how much time Mr. Swain actually spent at his house on each occasion, and after Mr. Wise having

heard Mr. Struss explain during the hearing that he set the time on the camera himself, which he later repeated during his deposition in this case. It is respectfully submitted that the uemployment appeal, based on clearly inadmissible evidence without any discernable probative value, was wholly frivolous and undertaken in bad faith in continuing retaliation for Mr. Swain's discrimination complaints.

The Supreme Court held in *Robinson v. Shell Oil Co.* that because the term "employees" in Title VII includes former employees an action will lie for retaliatory postemployment actions by a former employer. 519 U.S. 337, (1997), and the Eastern District of New York has held that such post-employment retaliation includes meritless opposition to an employee's application for unemployment benefits. *Liverpool v. Con-Way,* 2009 Dist. Lexis 41349 (EDNY 2009), as have a number of circuit courts. "There is no ground for affording any less protection to a defendant's former employees than to its present employees." *Hodgson v. Charles Martin Inspectors of Petroleum, Inc.*, 459 F.2d 303, 306 (5th Cir. 1972) (internal citation omitted).

## POINT VI: DEFENDANTS HAVE FAILED TO PRESENT ANY VALID DEFENSES

An employer has no affirmative defense to allegations of harassment based on membership in a protected class "when [a] supervisor's harassment culminates in tangible employment action, such as discharge, demotion, or undesirable reassignment." *Reed* at 32, furthermore, the majority rule is that a lawmaker does not have to have actual knowledge of the unconstitutional practices but constructive notice is sufficient. *Wright v. Town of Glenarden*, 89 F.3d 831 at 3(4th Cir. 1996).

### A. As to Defendants' claim to immunity

It is respectfully submitted that Defendant's affirmative defense of immunity must fail. State officials performing discretionary functions are shielded from liability for monetary damages if they can prove that their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known. *Anderson v. Creighton,* 483 U.S. 653 (1987); *Pinder v. Johnson,* 54 F.3d 1169 (4th Cir. 1995).

To establish qualified immunity a defendant must show: (1) that there was no previously established law prohibiting or restricting the conduct in question at the time it occurred; and (2) if the law was clearly established, that a reasonable officer under the circumstances would not have known the conduct was illegal. *Gomez v. Toledo,* 446 U.S. 635 (1980).

In the context of alleged violation of a plaintiff's constitutional rights, the plaintiff must allege a constitutional right that was well-established at the time of the incident. "In order to conclude that the right which the official allegedly violated is 'clearly established,' the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson* at 653. Whether the law was clearly established is a question of law for the court. It is the defendant's, not the plaintiff's burden to prove the status of the law. *Elder v. Holloway,* 510 U.S. 510 (1994).

There simply cannot be any doubt that the Defendants were aware that they were violating Plaintiff's constitutional rights when they performed the acts complained of. Furthermore, the doctrine of legislative immunity is clearly not applicable to the case at bar. Defendants' affirmative defense of individual immunity must fail as well. It is respectfully submitted that the Town defendants cannot rely on the defense of immunity when sued in their private capacity because "[t]he principles of qualified immunity shield an officer from personal liability [only] when an officer *reasonably believes that his or her conduct complies with the law." Pearson v. Callahan,* 555 U.S. 223, 244 (2009). It is clear that the members of the Town Board must have been fully aware of both the fact that they were not authorized under New York Town Law § 32 to terminate an employee in the Highway Department and that an employee could not be terminated without

29

being afford the disciplinary procedures prescribed by the Collective Bargaining Agreement; neither is it plausible that Ms. Jiava was not fully aware that privacy laws prohibited her from disclosing Mr. Swains medical information and to engage Defendant Struss to spy on him.

In *Hafer v. Melo* (502 U.S. 21 [1991]) the Supreme Court held that state officers may be held personally liable for damages under § 1983 based upon actions taken in their personal capacities because "§ 1983 was enacted to enforce provisions of the *Fourteenth Amendment* against those who carry a badge of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Id.* at 22. (internal citation omitted). "State Officials, sued in their individual capacities, are 'persons' within the meaning of § 1983. Unlike official-capacity defendants – who are not 'persons' because they assume the identity of the government that employs them – officers sued in their personal capacity come to the court as individuals and thus fit comfortably within the statutory term 'person.'" *Id.* (internal citations omitted).

B.  Plaintiff has satisfied the *Monell* doctrine

Under *Monell v. Dep't of Soc. Servs,* (436 U.S. 658 [1978]) "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" deprives a citizen of constitutional rights." *Id.* at 694. An official policy may be established in three ways: (1) the municipal entity adopted and promulgated a policy, the implementation of which caused the constitutional deprivation; (2) the policymaker failed to act affirmatively even though the need to take some action is obvious and the inadequacy of the existing practice is likely to result in the violation of constitutional rights; or (3) absent a formal policy, an official with policymaking authority violated federal law, causing the constitutional depravation.

It is respectfully submitted that by passing the formal resolution, thereby making it an accepted official policy to terminate an employee in violation of the disciplinary procedures set down by the CBA and by terminating him in apparent violation of his constitutional procedural rights there is simply no doubt that the requirements under the *Monell* doctrine have been satisfied.

Furthermore, "the plaintiff need not identify an express rule or regulation. It is sufficient to show, for example, that a discriminatory practice of… subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials." *Id.* (internal citations omitted). It is respectfully submitted that the facts of this case clearly establish that the members of the Town Board were fully aware of the racism and bigotry that permeated the atmosphere in the Highway Department as can be seen by the comment by Councilman William Beal, who stated to Mr. Sway during the public Town Board meeting on April 11, 2016, "I can tell you honestly diversity is key, okay; and, if there are people here who can't tolerate that, that's their problem." (**Ex. M,** p.3 ).

Even so, the Town failed to take any decisive measures to approach the problem as has been well established by Plaintiff; instead of resolving the ongoing problems by a firmly enforced policy change they elected to terminate Mr. Swain on pretextual grounds. For all these reasons it is clear that Plaintiff has met his *Monell* burden.

POINT VII: PLAINTIFF HAS ESTABLISH HIS RIGHT TO PUNITIVE DAMAGES

A court may award punitive damages when a defendant has demonstrated deliberate indifference towards the plaintiff. Deliberate indifference exists when "a policy making official was aware of constitutional injury [but] failed to take appropriate action to prevent or sanction" the violations. *Jones v. Town of E. Haven,* 691 F.3d 72, 81 (2d Cir. 2012).

31

"Plaintiff's punitive damages award... turns on whether the evidence supports an inference of intentional discrimination with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Johnson v. Strive East Harlem Empl. Group,* 990 F.Supp.2d 435, 450 (SDNY 2014) (internal citation omitted). "That requisite state of mind may be inferred from the circumstances and may be proved where egregious and outrageous acts themselves support an inference of the requisite evil motive." *Id.* (internal citations omitted).

As the facts of this case clearly show, Mr. Swain has suffered serious mental and emotional distress caused by the Defendants egregious and reckless discrimination, harassment, failure to address the hostile work environment, invasion of his privacy and ultimately his retaliatory termination and denial of unemployment benefits on the most frivolous and egregious grounds, and it is clear that therefore he is entitled to punitive damages.

Punitive damages are available against state or local officials in their individual capacity. "[I]ndividual public officers [are] liable for punitive damages for their misconduct on the same basis as other individual defendants" § 1983. *Smith v Wade,* 461 U.S. 30 (1983). (*Id.* at 35) when the act is "done willfully or was the result of that reckless indifference to the rights of others which is equivalent to an intentional violation of them. In that case, the jury are authorized... to give such additional damages as the circumstances require." *Id.* at 42.

The court of Appeals has decided that "mental injury may be proved by the complainant's own testimony, corroborated by reference to the circumstances of the alleged misconduct." *Matter of New York City v. Tr. Auth. v. State Div. of Human Rights,* 78 NY2d 207, 2016. Furthermore, "[d]ue to a strong, anti-discrimination policy spelled out by the Legislature of this State, an aggrieved individual need not produce the quantum and quality of evidence to prove compensatory

32

damages [under the Executive Law] that he would have to produce under an analogous provision." *Batavia Lodge No. 196 v. New York State Div. of Human Rights,* 35 NY2d 143, 147 (1947).

In *Shannon v. MTA Metro-North R.R.* the First Department found that the plaintiff's "detailed allegations that defendants intentionally and maliciously engaged in a pattern of harassment, intimidation, humiliation and abuse, causing him unjustified demotion[] ... and psychological and emotional harm" were sufficient to support the cause of action for intentional infliction of emotional distress. 269 AD2d 218, 218 (1st Dept. 2000).

Furthermore, the *Shannon* court found that "the cause of action was not barred by the one-year Statute of Limitations [but was] governed by *the continuing tort doctrine*, permitting the plaintiff to rely on wrongful conduct occurring more than one year prior to commencement of the action, so long as the final actionable event occurred within one year of the suit." *Id.* (internal citations omitted, emphasis added).

## CONCLUSION

For all the reasons stated herein it is respectfully submitted that Plaintiff's motion should be granted in its entirety.


Dated: White Plains, New York
        November 18, 2016


                                    Respectfully submitted,



                                    Gunilla Perez-Faringer, Esq.
                                    *Attorney for Plaintiff*
                                    34 South Broadway, Suite 605
                                    White Plains, New York 10601
                                    (914) 574-3708
                                    faringerlaw@gmail.com